323-0162 Otter Creek Center Shopping, LLC Appellant v. NE Capital Group BSD, LLC Appellee. Mr. Rickleman, you may proceed. Thank you, Your Honor. For the record, this is Paul Rickleman, R-I-C-K-E-L-M-A-N on behalf of the Appellant, Otter Creek Shopping Center, LLC. This case was brought to trial court as a contract dispute between Otter Creek and Northeast or NE Capital. Both parties claimed that the other party breached the contract, focusing mostly on a lender's consent which was the assumption of a mortgage that was required as part of the transaction to close on the property. Two partial summary judgment motions were brought by Otter Creek procedurally. One had to do with this lender's consent, the assumption of the mortgage approval. The other had to do with the waiver on the counterclaims brought by NE Capital. After both of those, NE Capital also brought counter summary judgment motions, cross summary judgment motions on both of those issues. The court heard oral argument after briefing on both of those motions of per partial summary judgment and ruled in NE Capital's on both motions, ruled in its favor. It was summary judgment was granted on both of the motions of NE Capital and denied on both of the motions of Otter Creek. It is for that reason that this case is brought up on review to this court that de novo review of the summary judgment rulings would be appropriate as this court can substitute its own review of the law to arrive at the appropriate decision. The basis for the trial court's ruling was predominantly or primarily on the court's conclusion that the lender's consent letter, this assumption letter that was provided by the existing mortgage servicer had modified the loan agreements that were existing on the property that were signed back in 2013, about three or four years before the parties entered into a contract for the sale of the property. It was argued not in the briefs, but at the hearings that the lender's consent could not have modified the loan agreements. And if they were able, it was perceived that they did, there was clear evidence that they did not. The issue that is most primarily brought for review to this court is that the court, the trial court did not have an ability to ever review these loan documents. So it was impossible for it to make a conclusion legally or factually that the lender's consent modified the loan agreements in any way. If we look at- Councilor, however, this is de novo review. Yes. And we do have the ability to look at the loan documents because you attached them to your post-trial motion. Of course, this court does, yes. And we can affirm or reverse on any grounds for which there's a basis in the record. So that in and of itself, the fact that the trial court did not have the loan documents in front of it cannot automatically be a grounds for reversal. Would you agree? I would agree with that. And my final point was that I attempted to bring a reconsideration motion so the court had the opportunity, the trial court had the opportunity to review the substance and specific language of these documents and that motion for reconsideration was denied. Well, don't use your time on that. Talk to us about what's before us. Of course, Ron. Now, if we look at the loan documents themselves, there was exhibit, there was language within the body of the loan documents as well as an exhibit, a schedule for maintenance. The loan documents gave the mortgage servicer broad authority to require the borrower to make maintenance to perform maintenance under this language in accordance with these schedules. Now, if we compare and contrast that with the lender's consent letter that was provided as part of the assumption transaction to close this deal that developed this dispute between the parties here, a very similar thing occurred. One of the 17, I think, items on the lender's consent letter number 15 required that within 120 days of closing, any capital will be required to perform some maintenance to the parking lot. Back in 2013, when the loan was closed, there was a 90-day requirement for Otter Creek to perform maintenance. And it is clear from the lender's consent letter that this requirement was done under the loan documents. That's a quote from the letter that was cited throughout the briefs. The loan documents gave that authority power to Wells Fargo, to the servicer here. And it's no distinction between those two obligations. The maintenance obligations always were presented, always were made clear under the loan documents. So that, I would argue that makes it clear that the loan assumption letter, the lender's consent letter did not modify these loan documents. What about the strict 120-day, if you don't get it done, you'll be considered in default language in the consent document? Yes, Your Honor. It says under the loan documents, there is a 120-day deadline that it would be an event of default, which was already defined and within the loan documents itself. And exactly where is that in the loan documents? I don't have that citation right in front of me. I apologize. I believe it's in my brief. Well, what does the purchase and sale agreement say about this? About what specifically, Your Honor? Well, I mean, is this maybe just a purchase and sale agreement that had provisions in it? Yes, the purchase and sale agreement had many provisions. It's modified twice. It was entered into in November of 2016. About three months later, there was a formal amendment, the first amendment that was drafted. And then about 18 months after that, there was a second amendment. And the second amendment deals with a lot of the issues that have developed in the conclusion or the development of the dispute between the parties. The second amendment required that the lender's consent was obtained by a certain date, by a certain deadline. And that occurred, but any capital is still unable to close. So as far as whether or not, and the agreements also stated that the borrower, the assumption borrower, any capital would not have to accept any modifications to the loan documents. So that is where the trial court's ruling comes from, an analysis of that. But I would submit as I did in the briefs that there was no modification to the loan documents and that the assumption was the contractual obligation of any capital, it was provided and they failed to close. In the context of all of this, whether or not the lender's consent was or was not provided legally, because this was a summary judgment, I think there's been a misapplication of the law in that the court determined it had to pick a winner or loser on summary judgment when the more appropriate ruling would have been looking at the competing motions for summary judgment most favorable to the non-moving party, there's clearly some genuine issues of fact that should have at least been presented to the fact finder at trial. What issues, competing issues of fact are you contending there are? Well, because first off, most importantly was the loan documents themselves. Everybody had an argued extensively on the lender's consent letter, but the loan documents were never analyzed. And I think it's fair to review the industry, well, it's express language and also industry custom regarding the approvals that were granted. And- Council, is there some reason why you didn't submit the loan documents in response to the motion for summary judgment? In response to? Well, in the motion for summary judgment, you've given an opportunity to reply or respond. Yes. Why didn't you submit the loan documents then? It was never argued by either side that there was a modification. It was never argued by any capital that there was a modification of the loan documents. Go ahead. So that's why. And then when it became, when that change occurred, when that issue did arise at the hearing is when I attempted to submit those documents for review. And then of course, followed with the motion for reconsideration. So are you saying before us, because we do have all of this now apparently, that we have to do a de novo review to see whether or not the Wells Fargo letter modified the loan agreement? Yes, sir. I would submit that that would be appropriate. Okay. And why do you say that it was not a modification? Well, it was not a modification because the letter, the lender's consent letter regarding the maintenance obligation said expressly stated under the loan documents, this must be performed. So if you have the loan documents and can look back at the language of the loan documents, there are maintenance obligations that are imposed upon the borrower, number one. And number two, there was express schedules that reference those terms of the loan documents of the mortgage that state what had to be done. The 120 day obligation to repair the parking lot, to maintain the parking lot was something similar that had occurred at the loan closing, the initial loan closing back in 2013. And that imposition, that requirement was put on under the loan documents. So it was clear from the consent letter that that was being requested and imposed based on the existing language of the agreements of the loan documents. There was no modification of it. That wasn't an additional term. So your case rises or falls on that determination? Yes, sir. Okay. So it's a fairly simple case, right? It's a very simple case, yes. And for those reasons that I've argued, and as I stated in my briefs, we think granting a summary judgment was not proper in favor of Northeast Capital. And I rest on the argument there. Any questions, further questions from the bench? None for me. I don't have any. Okay, Mr. Rickman, you'll have time in reply. Thank you, Your Honor. Mr. Ray, you may respond. Good afternoon. May it please the court. My name is John Ray and I represent the appellee, NE Capital Group BSD LLC. This case comes to the court on the party's cross motions for summary judgment, which were granted in favor of the appellee, NE Capital. Where the parties filed cross motions for summary judgment, the law in Illinois is clear. As in this case, they agree that there is only a question of law at issue. And they asked the trial court, the circuit court, to decide that legal issue. In this case, the question therefore, is whether as a matter of law and applying de novo review for this court, the conditional approval letter, and those are the terms that Wells Fargo actually wrote, conditional approval letter are provided by Wells Fargo, the lender in this case, satisfy the definition of lender's consent in the purchase and sale agreement between the parties as a matter of simple contract interpretation. There are no disputed issues of fact. This is an interpretation of contract language. Even if there are disputes about when the court did or did not review and what the loan documents say, what the loan documents say, and then comparing that to the definition of lender's consent is simply a matter of contract interpretation. It's a legal question, which is exactly what the parties submitted and this court may decide. The definition of lender's consent in section 4.1 of the purchase agreement required Wells Fargo to consent to the loan assumption by any capital by, and I'm quoting here, indicating in writing that it had completed its underwriting and two, that it approved the loan assumption, and again, I'm quoting, by a purchaser subject to the execution of the final loan assumption documents. That's the definition of lender's consent essentially. Two components, Wells Fargo had completed the underwriting and it approved the assumption subjects only to the execution of the loan documents. The problem for Otter Creek and what the circuit court correctly determined was that lender's consent didn't provide for additional conditions beyond simply executing the loan assumption documents. In fact, in section 4.2 of the purchase agreement, it explicitly states that there could be no additional material obligations placed upon any capital. The further problem, of course, is then that Wells Fargo in its conditional approval letter added additional terms to the obligations for the loan assumption. And there was this exchange and it was actually pretty telling between the circuit court- And you're saying, Mr. Ray, that those are material. Yes, and we- They have to be material, right? Do you agree? Yes, I would agree that they have to be material. And that is the review that the circuit court undertook. It focused on paragraph 15 because it said, well, I'm gonna go through some of these other ones. I don't find them to be very material, but I will focus on this deferred maintenance obligation. So it certainly does have to be material, but the deferred maintenance obligation is material. And I wanna get into the reasons why, but I do wanna highlight very quickly, there was an exchange. We do mention it in our brief between the circuit court and counsel for Otter Creek in which the court was very clear. Well, if these things are already in the loan documents, what's the need to put them into a conditional approval letter? The issue was none of these things that Wells Fargo was requiring were in the loan documents. They were materially different, which is precisely why Wells Fargo was very specific in identifying them as conditions for which it would give its consent. But even in the first instance, the underwriting wasn't complete. It never was. There was no lender's consent simply for that reason alone. We don't even get beyond it. There simply was no completion of the underwriting that Wells Fargo may have later completed it and consented under even fewer limited terms simply doesn't get any Otter Creek where it needs to be, which is lender's consent is the underwriting is completed. The lender has indicated it's complete. That never happened in this case. That is problem number one. Number two, we move on. What's the significance of that? That it's complete? No, of underwriting, the under, yeah. The significance of it. Well, help some of us or help me particularly with the underwriting is whatever. What is it you mean by that? Sure, the underwriting is the process through which the lender goes in reviewing all of these issues that make sure there's been compliance with the terms of the loan agreement to make sure that the lender, the proposed new lender who's conducting the assumption meets the qualifications and would satisfy the lender that it has the credit and various other documentation and things in place. So the underwriting is a very significant process for the lender to be assured that it's willing to agree to these issues. And another- There's no new lender here. Is there, or who's the new lender? No, no, no, there's not a new lender. You used the term new lender. I think you mean new borrower. A new borrower. I may have, I may have- Yeah. Thank you. No, it is the new borrower would meet the terms financially and then in terms of the documentation to satisfy the lender that it's credit worthy and can obviously assume the conditions of the loan. One of the things also in that process, of course, is a review of the prior borrower and to determine whether that borrower's in compliance. One of the most significant issues that also the circuit court raised was with these new maintenance obligations, if the issue was that these were all these obligations of complying within 90 days or even 120 days, we're already in the loan documents. The problem again for Otter Creek is these issues were identified by Wells Fargo in January and its lender's consent letter, it's a conditional letter, was in April. We're talking well past the time period where Otter Creek would have already been in an event of default and could have never even closed the loan if these, the loan documents, the underlying loan documents, provided that Wells Fargo could call an event of default merely by the failure to complete the deferred maintenance. The reason why that's significant, as was pointed out previously, is the ability to call an event of default is substantial. It means that the loan can be called in and required to be paid all at once. That, of course, wasn't there because, and it wasn't in the loan documents, because if it were there, Otter Creek was already in default. It hadn't repaired this deferred maintenance identified in January when the letter is coming out in April, four months later after the inspection. The issue is, of course- So to make it real simple, Mr. Ray, until there's an assumption of the borrower, which was Otter Creek- Yes. Had 90 days to correct deferred maintenance, correct? Not exactly correct, no. That was another material difference, is that there was never a specific day requirement in the loan documentation. So if we look at the loan documentation, and specifically in, I believe it is section, I don't want to make sure- Well, let's not go into a lot of that. Just kind of give me the broad 30,000-foot picture here. Fair enough. The loan document was clear. You could promptly, it only required that the borrower, quote, promptly repair. It didn't have a specific day requirement. So when Wells Fargo added a specific 120-day requirement, rather than simply promptly repair, is actually the language in the loan documentation, it added a very specific- So you're saying that's a material change? That's a material change. Yeah, let's make it simple here. Fair enough. So that the lender, Wells Fargo, could go onto the property at any time and identify deferred maintenance, correct? No, it could not. Okay. It, no, it could not. It couldn't, it certainly could identify it and request that it repaired under this prompt repair provision. But what it couldn't do is, as it did with the original loan assumption, I'm sorry, loan application, create this Schedule II and say, here's the 90 days, that was original. And the issue is, of course, with a loan assumption, you're coming in and stepping into the shoes of the original borrower. Correct. And so there wasn't the ability of Wells Fargo to amend Schedule II and have this 90-day requirement. It was the older, the other requirement of simply promptly repairing. So that right there is a material modification, a specific day requirement. Number two, that it created an event of default, if there wasn't compliance, which was not in the original loan documentation, was a significant modification. These things substantially changed the underlying loan documents, which the circuit court reviewed and said these particular provisions are material. They changed the obligations. Was there the court's belief? And of course, Ms. Rickleman had an obligation to put forward the loan documentation to suggest otherwise. And even if he didn't at that time or didn't believe he had to, he certainly did it in his motion to reconsider. And we can all look at it now, since we're on de novo review. But these are the substantial ways in which the conditional approval letter did not comply with the definition of lender's consent. It was much broader. It did not comply with section 4.2, that there are no modifications that could be placed. And these were material modifications. If you compare, as we have in our brief, and identified specifically the provisions required by Wells Fargo versus what was in the actual loan documentation. And I wanna be clear, Wells Fargo did not, in the conditional approval letter, cite to any specific provisions in the loan documentation pursuant to which it had any authority to make the demands. In fact, it simply referenced the loan documentation generally, not as authority for the proposition that it had the right to do this. Wells Fargo's right was simply, it wasn't going to consent unless Otter, I'm sorry, any capital agreed to these new terms, which it had no obligation to do. When Wells Fargo failed to provide lender's consent, failed to provide simply approval, completion under the underwriting process, it failed to comply with section 4.1, the terms of the party's agreement for which the loan assumption was supposed to be conducted. There simply would be approval. No changes, no modifications, just approval and acceptance of the loan documentation. That never happened in this case. The circuit court correctly determined that it never happened in this case. And therefore, summary judgment was appropriate in favor of any capital, unless there are any further questions. Is your position that approval, Wells Fargo approval of the new purchasers becoming a borrower now, obligated under the agreement, the mortgage agreement, correct? That's correct. That the only thing Wells Fargo should have been, to make this deal work, is whether they were credit worthy or not, the new borrower, the new purchaser? Under its processes and review in the underwriting, essentially that is what it's looking at. I think there are a few other things in terms of the proper documentation, but that's ultimately- No, I mean that in the big picture, 30,000 feet. Is there a new borrower credit worthy? Are they going to pay on time? But the original mortgage allowed the lender to require deferred maintenance be completed, correct? Yes. Uh-huh, yeah, yeah, right. But it said promptly, upon probable notice. Right, it said promptly repair it. There was no time period. And- That's the point, my next question. There was no time period defining promptness. Correct. And you're saying that's a material change. That is material change, number one. And there was no- That's sufficient? Is that your argument? That is sufficient in and of itself, yes. Okay, but you're saying besides that, what's your second point? Second point is that the Wells Fargo letter said, if it didn't complete it within a specific time limit, that would constitute an event of default under the loan documents. There is no provision that allowed under the original loan documents for Wells Fargo to state if you don't complete it or repair, even promptly, that that would be an event of default. That doesn't occur. The only reference was that it would be an event of default under the loan documents because the loan documents define what an event of default was. That was the reference to the loan documents, but there's no specific provision that says if you don't prompt- We're getting a cut out here, a delay. He's frozen. Yeah, in the audio and video. I think he's the only one frozen. It would be an event of- Oh. Are you able to hear me now? Yes. Now we can. Maybe you could go back and repeat. And I will. And very briefly, it was the addition of the event of default condition, which was never an allowed remedy for a failure to promptly repair deferred maintenance. Yes, event of default conditions are in the loan document. Never in the loan document was a failure to timely repair an event of default. So when Wells Fargo added that, that was another material modification because that meant if any capital didn't complete the repairs in the time period, which of course Wells Fargo couldn't require under the loan documents, it could declare an event of default and call that loan due, which it could not do under the loan documents. The only reference to an event of default was simply the debt condition and the consequences. Okay. I think we're frozen again. The time is up. Which of course, we're in the loan documentation. Issue sustained in our brief. Well, your- Thank you. Your time is up, Mr. Ray, unless there's some questions from the court. I have none. I have none. Thank you. Thank you. Mr. Rickleman, you may reply. Thank you, your honor. Initially, I think we need to look at this simply and not, there's a lot of discussion about inserting terms into the loan document and the agreements. They speak for themselves and we should, in analyzing this dispute and this review brought de novo, there's no need to change, modify, or alter the language that was presented to the court. The loan documents clearly contain terms that authorized Wells Fargo to impose maintenance requirements for the protection of the loan product that they provided to the borrower. This was under section 4.12 of the loan documents. Now, Mr. Ray argued that the underwriting had not been completed. I think the record disputes that position and that there was testimony from a Harold Hammond, who was the principal person at Wells Fargo in charge of the assumption application. And he testified at that deposition that the underwriting was completed, that this was a typical assumption transaction, and also that there were, number one, Mr. Ray pointed out to the court a January 2019 property condition report. And then the date of the lender's approval assumption letter was April, four months later. In that intervening time, Otter Creek performed a number of items of maintenance. There were still additional items of maintenance it appears that were required to be done, but let's not forget the fact that Otter Creek was actively maintaining, operating, monitoring a very large shopping center. It wasn't a vacant property, it wasn't a brand new property. They were properly managing the property as it existed. Mr. Hammond, the Wells Fargo representative also testified about the amount of reserves that were in place in the borrower's account that would be sufficient to cover any type of maintenance. So circling back to the beginning, the loan document itself provided a term that authorized Wells Fargo to make sure that the borrower was maintaining the property. I don't think that there has been any material changes. The promptly versus time period, we can argue whether 120 days is prompt or not, but I don't think that that language in the approval letter materially modifies a 100-page loan agreement and multiple contract documents. What about the language that says if it's not done in 120 days, it's deemed an event of default? I think that that was appropriate under the loan documents as it was stated 4.12. If they didn't comply with the request, they would be in default. I think that's exactly what the language says. I think it was advisory in the letter. There was a number of obligations that were required, something simple as provision of documents, corporate structures, things of that nature that would be present in any complex commercial transaction such as this to focus on the requirement that's plainly presented by the loan documents already, the maintenance requirements, to focus solely on that, to suggest that the loan documents were modified or that the approval wasn't granted seems outrageous from Otter Creek's perspective. And for those reasons, we think summary judgment was granted in favor of any capital, was not properly granted in favor of any capital. Thank you, Your Honor. Any questions from the court? None from me. Me neither. Okay, thank you, Mr. Rickleman. Thank you, counsel, both for your arguments in this matter this afternoon. It will be taken under advisement and a written disposition will issue.